
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/24/20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ELINSON CEPEDA,

Plaintiff,

-against-

COMMISSIONER OF SOCIAL SECURITY,

Defendant.

19-CV-4936 (BCM)

**OPINION AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiff Elinson Cepeda filed this action pursuant to § 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), seeking judicial review of a final determination of the Commissioner of Social Security (the Commissioner) denying his application for Disability Insurance Benefits (DIB). The parties consented to the disposition of this case by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c) (Dkt. No. 13) and cross-moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). For the reasons set forth below, plaintiff's motion (Dkt. No. 15) will be denied, defendant's motion (Dkt. No. 19) will be granted, and the case will be dismissed.

## I. BACKGROUND

### A. Procedural Background

Plaintiff submitted his application for DIB on August 20, 2014, alleging disability since July 25, 2014, due to major depressive disorder, anxiety disorder, and attention deficit hyperactive disorder (ADHD). *See* Certified Administrative Record (Dkt. Nos. 11, 11-1) (hereinafter "R. __") at 191, 270. The Social Security Administration (SSA) denied that application on February 26, 2015. (R. 84.) On October 29, 2015, plaintiff requested a hearing before an Administrative Law Judge (ALJ). (*See* R. 10, 101.) On September 1, 2017, plaintiff appeared by videoconference before ALJ Jack Russak, who adjourned the hearing to give plaintiff an opportunity to retain counsel. (R. 73-83.) The ALJ warned plaintiff, several times, that he was entitled to only one

postponement for this purpose. (R. 74, 76, 79, 80; *see also* R. 162.) On December 22, 2017, plaintiff appeared again before ALJ Russak, via videoconference, without counsel. (R. 42.) Plaintiff initially asked that the hearing again be postponed – explaining that he "made a few phone calls" but did not find counsel to represent him – but then agreed to "go ahead." (R. 42-43.) During the hearing, vocational expert (VE) Victor G. Alberigi also appeared and testified. (R. 58.)

In a written decision dated March 23, 2018 (the Decision), the ALJ determined that plaintiff was not disabled within the meaning of the Act. (R. 10-19.) On May 21, 2018, plaintiff requested Appeals Council review of the Decision. (R. 188.) The Appeals Council denied that request on March 27, 2019 (R. 1), making the ALJ's determination final.

**B. Personal Background**

Plaintiff was born on June 11, 1983 and was 31 years old on the alleged onset date of July 25, 2014. (R. 81, 84, 85-86.) He completed high school and one semester of college. (R. 51, 271.) He lives with his sister and her family, including a nephew who was 8 years old at the time of plaintiff's hearing. (R. 48, 55.)

Before plaintiff's alleged onset date, he worked in a variety of jobs, including in security and as a bus driver. (*See* R. 239-43.) In his Disability Report, plaintiff stated that in July 2014, he stopped working because his depression "caused lots of pain" which made it difficult "to get motivated to go to work." (R. 270.) After his alleged onset date, however, plaintiff continued to engage in substantial gainful activity (SGA), as defined in 20 C.F.R. § 404.1572, in both 2015 and 2016. (R. 239-40, 304.)[1] In 2017, his reported earnings were minimal. (R. 46, 264.)

[1] In 2016, plaintiff earned $14,286.93, working primarily as a courier. In 2015, he earned $14,526.94, working primarily for companies providing security services. In 2014 – the year in which he applied for DIB – plaintiff earned $13,074.00, which also exceeded the then-current SGA threshold. (R. 239-40.)

## II. MEDICAL EVIDENCE

### A. Treatment Records

#### 1. 2014

Plaintiff visited his primary care physician, Cecilia Calderon, M.D., on January 18 and 24, August 1, September 24, November 14, and December 3, 2014, for physical examinations and routine care. (R. 321-41.) During the January 18 and August 1 visits, plaintiff was administered the PHQ-2 depression screening questionnaire with negative results. (R. 321, 328.)[2] Dr. Calderon also repeatedly wrote that plaintiff was well-appearing, well-developed, and in no acute distress. (R. 326, 328, 331, 333.) Dr. Calderon twice noted that plaintiff had "good memory and speech," no nervousness, no tension, good mood, no unusual perceptions, no obsessions or compulsions, and no current suicidal ideations. (R. 323, 329.) Dr. Calderon diagnosed plaintiff with tobacco use disorder, a back disorder NOS (not otherwise specified), obesity, and anxiety disorder NOS, for which she referred him to "Psychiatry." (R. 321, 323.)

On April 17, 2014, plaintiff was seen by psychiatrist Arturo Marrero-Figarella, M.D. at Boston Road Medical Center (Boston Road) for evaluation. (R. 343-45.) Dr. Marrero-Figarella noted that plaintiff's chief complaint was depression and anxiety, and that he reported symptoms including loss of energy, housework not getting done, angry outbursts, no longer enjoying activities he previously enjoyed, difficulty concentrating, memory problems, difficulty sleeping, and feelings of worthlessness. (R. 343.) Plaintiff denied suicidal ideation or intent, hallucinations,

---

[2] The PHQ-2 is a "preliminary screening tool" for depression. If the patient responds no to both questions, "then no additional screening or intervention is required." New York State Dep't of Health, "Administering the Patient Health Questionnaires 2 and 9 (PHQ 2 and 9) in Integrated Care Settings" (2016), available at https://www.health.ny.gov/health_care/medicaid/redesign/dsrip/2016-07-01_phq_2_and_9_clean.htm (last visited Nov. 24, 2020).

delusions, or other symptoms of psychotic process. (*Id.*) Dr. Marrero-Figarella stated that plaintiff "has been in treatment" at Bronx Lebanon Hospital but "has poor compliance"[3]; that his medication history included the antidepressants Wellbutrin and Prozac; and that he was "an unemployed assembly line worker." (*Id.*)

During Dr. Marrero-Figarella's examination, plaintiff presented as "friendly, sad looking, guarded, wary, distracted, fully communicative, casually groomed, overweight, but tense[,] but [sic] appears anxious." (R. 344.) Plaintiff's demeanor was sad, but his language skills were intact and there were no apparent signs of hallucinations, delusions, bizarre behaviors, or other "indicators of psychotic process." (*Id.*) Plaintiff's associations were intact, his thinking was logical, and his thought content was appropriate. (*Id.*) His cognitive functioning, fund of knowledge, and short-term and long-term memory were all intact, and he was fully oriented. (*Id.*) According to Dr. Marrero-Figarella, plaintiff's insight into problems and social judgment were "fair," and he showed "signs of anxiety," but no signs of hyperactive or attentional difficulties. (*Id.*) Plaintiff's behavior during the session was "cooperative and attentive with no gross behavioral abnormalities." (*Id.*)[4]

Dr. Marrero-Figarella diagnosed plaintiff with major depressive disorder (recurrent episode, moderate) and anxiety disorder. (R. 344.) He recommended psychotherapy and medication management. (*Id.*) Dr. Marrero-Figarella prescribed the antidepressants Wellbutrin and Trazodone, and the antipsychotic medication Abilify. (*Id.*)

---

[3] The administrative record in this action does not include any treatment notes or other records from Bronx Lebanon Hospital.

[4] At times Dr. Marrero-Figarella's 2014 evaluation appeared to be internally inconsistent. For example, plaintiff was described as both "calm" and "tense." (R. 344.) His ability to "abstract and do arithmetic calculations" was intact, but "[s]imple arithmetic calculations [were] not correctly performed" and "[t]here is difficulty thinking abstractly." (*Id*.)

**2. 2015**

Plaintiff returned to Dr. Marrero-Figarella nine months later, on January 30, 2015. (R. 346.) In a progress note, Dr. Marrero-Figarella wrote that plaintiff "continues to be inattentive" and "does not seem to be listening when spoken to directly." (*Id.*) He also noted that plaintiff is "still disorganized," avoids "[t]asks that require sustained mental effort," and "continues to often lose things necessary for tasks or activities." (*Id.*) He still had symptoms of depression and irritability, and had difficulty concentrating. (*Id.*) Dr. Marrero-Figarella wrote that plaintiff "[p]resents as friendly, glum, sad looking, wary," tense, anxious, and unhappy. (*Id.*) His speech was normal, language skills and memory were intact, thought content was depressed, and demeanor was glum. (*Id.*) Plaintiff showed signs of "moderate" depression and anxiety, and his insight and social judgment were "poor." (*Id.*)[5]

Dr. Marrero-Figarella's diagnoses were major depressive disorder (recurrent episode, moderate), generalized anxiety disorder, and ADHD (predominantly inattentive presentation). (R. 346.) Dr. Marrero-Figarella also wrote, "R/O" [rule out] Bipolar II Disorder. (*Id.*) Dr. Marrero-Figarella recommended medication adjustments and psychotherapy. (R. 346-47.) He continued plaintiff on Trazodone, decreased Effexor,[6] and prescribed Concerta, a central nervous system stimulant used to treat ADHD. (R. 347.) Dr. Marrero-Figarella noted that plaintiff was "stable at the present time and does not require psychiatry hospitalization." (*Id.*)

[5] Certain portions of Dr. Marrero-Figarella's 2015 progress note appear inconsistent with his prior evaluation. For example, he wrote that plaintiff "continues to fidget with hands or feet or squirm in seat," "continues to leave his seat when he is supposed to stay seated," and "still runs around or climbs" in situations "in which it is inappropriate." (R. 346.) There was no mention of these behaviors in the 2014 evaluation, other than a brief note that plaintiff was "restless." (R. 344.)

[6] It is not clear when, or by whom, Effexor was prescribed for plaintiff.

**3. 2017**

Almost two years later, on January 5, 2017, plaintiff returned to Dr. Marrero-Figarella, once again complaining of "depression, anxiety, and poor attention span." (R. 351-53.) Dr. Marrero-Figarella wrote that plaintiff experienced "primarily depressive symptoms intermingled with symptoms of manic process." (R. 351.) His symptoms included loss of energy, no longer enjoying activities he used to enjoy, crying spells, fatigue, feelings of worthlessness, decreased sociability, and difficulty sleeping. (*Id.*) He told Dr. Marrerro-Figarella that "no medications" were "currently taken." (R. 352.)

On examination, Dr. Marrero-Figarella found plaintiff "flat, glum, sad looking, guarded, wary, distracted, casually groomed," tense, anxious, and unhappy. (R. 352.) However, plaintiff's affect was "appropriate, full range, and congruent with mood." (*Id.*) There were "[n]o apparent signs of hallucinations, delusions, bizarre behaviors, or other indicators of psychotic process." (*Id.*) His associations were "intact, thinking is logical, and thought content appears appropriate." (*Id.*) Plaintiff had no suicidal ideations, and his cognitive functioning and memory were intact. (*Id.*) His insight and judgment were "fair." (*Id.*) Plaintiff was still "restless" and "fidgety." (*Id*.)

Dr. Marrero-Figarella assessed major depressive disorder (recurrent episode, moderate); generalized anxiety disorder; ADHD (predominantly inattentive presentation); and, for the first time, bipolar II disorder. (R. 352.) He recommended psychotherapy and medication management. (*Id.*) He prescribed Trazodone, Wellbutrin, Concerta, Latuda (for bipolar depression), and Xanax (for anxiety). (R. 352-53.) He concluded, again, that plaintiff "is stable at the present time and does not require psychiatry hospitalization." (R. 353.)

Eight months after that, on September 23, 2017, plaintiff presented to the emergency room at Jacobi Medical Center (Jacobi), complaining of "all over body pain" and "depression." (R. 359.) The hospital notes indicate that plaintiff had a "flat affect" but was "not suicidal." (*Id.*) Plaintiff

denied using any drugs and said he was employed as a cab driver. (R. 364, 366, 368.) A psychiatric evaluation was performed by Indhira Almonte, M.D., who reported that plaintiff said he wanted "to go back on treatment as for the past few weeks he has been feeling depressed and anxious." (R. 366.) Plaintiff also told Dr. Almonte that he had not seen Dr. Marrero-Figarella in seven or eight months, explaining that he "liked his psychiatrist" but stopped treatment because he "did not like the clinic setting." (*Id.*) Plaintiff further advised that since he had not been taking his medications, his symptoms "returned." (*Id.*) Additional stressors included the fact that he owed money and had been living with his sister. (*Id.*) Dr. Almonte performed a mental status examination, which was almost entirely normal, except that plaintiff's affect was "constricted." (R. 368.) His mood was "better after talking." (R. 368.) Dr. Almonte diagnosed major depressive disorder (recurrent, unspecified), with a Global Assessment of Functioning (GAF) score of 55. (R. 369.)[7] Rather than admit plaintiff to the hospital, Jacobi discharged him with a "community referral." (R. 367.)

In a "supplemental" note dated October 4, 2017, Ludmila Levin, M.D., an emergency room physician at Jacobi, wrote that plaintiff presented with "generalized fatigue" and complained of

[7] "GAF rates overall psychological functioning on a scale of 0-100 that takes into account psychological, social, and occupational functioning." *Zabala v. Astrue*, 595 F.3d 402, 405 n.1 (2d Cir. 2010) (citing American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, at 34 (4th ed. rev. 2000) ("DSM-IV")). A GAF score of 55 is within the range of "moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers)." *Id.* at 405 n.3 (quoting DSM-IV, at 34). The Fifth Edition of the DSM discarded the use of GAF scores, *see Morales v. Berryhill*, 2018 WL 679566, at *1 (S.D.N.Y. Jan. 8, 2018), and in 2013, the SSA issued a bulletin limiting the use of GAF scores in disability proceedings, noting that "there is no way to standardize measurement and evaluation." SSA, "Global Assessment of Functioning (GAF) Evidence in Disability Adjudication," AM-13066 (July 22, 2013), *revised* (Oct. 14, 2014). The Commissioner may still consider GAF scores as one factor among others. *Mitchell v. Colvin*, 2015 WL 5306208, at *12 (S.D.N.Y. Sept. 10, 2015).

"not having energy." (R. 364.) He was depressed, but denied any suicidal ideation. (*Id.*) Dr. Levin noted that plaintiff was "medically cleared for [transfer] to psych ED." (*Id.*)

Following his hospital visit, on October 13, 2017, plaintiff went to Brightpoint Health for an assessment with psychiatric nurse practitioner (NP) Dongjin Kim. (R. 354-56.) NP Kim noted that plaintiff had "a history of [d]epression since 2006 with intermittent therapy and medication management." (R. 354.) Plaintiff reported that "the majority of his depression stems from the loss of his mother who was his greatest support." (*Id.*) He told NP Kim that he was "currently going through 'a lot of depression' and needs medication and therapy." (*Id.*) Plaintiff also revealed that he "took cocaine the same day as this intake," and "uses molly on weekends," but denied that he had a substance abuse problem and explained that he used drugs "to self-medicate his depression and anxiety." (*Id.*)

Plaintiff's mental status examination was largely normal, though NP Kim noted that his affect and mood were depressed, sad, and flat. (R. 355.) NP Kim assessed a "severe episode of recurrent major depressive disorder, without psychotic features," together with anxiety and substance abuse. (*Id.*) Kim recommended that plaintiff re-start Trazodone, add Zoloft (for depression and anxiety), and attend psychotherapy biweekly. (R. 355-56.)

### B. Opinion Evidence

The administrative record contains a single item of medical opinion evidence: from state agency psychologist S. Bhutwala, Ph.D., who completed a disability determination on February 26, 2015. (R. 85-92.)[8] After summarizing plaintiff's medical records (including the 2014 and 2015

---

[8] ALJ Russak requested a medical source statement from Dr. Marrero-Figarella at Boston Road three times (on December 26, 2014, January 9, 2015, and January 23, 2015). (R. 276.) Dr. Marrero-Figarella did not respond.

notes from Dr. Marrero-Figarella), and completing a mental function worksheet, Dr. Bhutwala concluded:

> Clt suffers from severe impairments that do not rise to Listings level. He can understand and follow simple instructions, and make simple decisions. The severity of his impairment may pose mild to moderate restrictions on his ability to complete a normal work day/week w/o experiencing interruptions from psychologically based symptoms, to respond appropriately to supervisors and co-workers, and to adapt to changes in a work setting. The clt is capable of simple, entry level rote work in a low contact setting.

(R. 92.)

## III. HEARING

At his hearing on December 22, 2017, plaintiff acknowledged that in 2016 he worked several jobs and earned $14,286 in income. (R. 45-46.) In 2017, however, he only made $219. (R. 46.) His work history included stints as a security guard in an apartment building (R. 60-61) and a bus driver. (R. 62-63.)

Plaintiff testified that his medical records were complete "[u]p till now" (R. 44), that he had no "physical problems" (R. 46), and that his medications included Zoloft and Xanax for anxiety, Trazodone as a "sleep aid," and Soma, which is a muscle relaxer. (R. 47.)

Plaintiff testified that he graduated from high school and went to college for a semester and a half. (R. 50-51.) He stated that he lived with his sister, nephew, and his sister's boyfriend. (R. 48.) Plaintiff's driver's license was expired. (R. 48.) He went to church "at least twice a month" with his aunt. (R. 48-49.) He testified that he enjoyed playing video games and cards, liked to fish, and went on a fishing trip in August 2017 with two friends. (R. 49.) His sister cooked for him, but he helped his sister grocery shop, and did his own laundry. (R. 54.)

Plaintiff testified that he spent his time on the computer at the library, as well as on his tablet at home, researching and online shopping. (R. 54-56.) He also spent time with his 8-year-

old nephew, whom he sometimes took to school and picked up. (R. 54-55.) Plaintiff sometimes helped his nephew with homework. (R. 55.)

When asked if he had been "seeing [his] doctors regularly," plaintiff testified that he saw NP Kim monthly (R. 51),[9] and that he had previously seen another doctor (presumably Dr. Marrero-Figarella), who "closed my case because I missed a few appointments." (*Id*.) Plaintiff further testified that he went to Jacobi for "very serious symptoms of anxiety" (R. 52), and that the hospital "kept me for about five hours after . . . midnight" before discharging him. (*Id*.) Plaintiff stated that the medications NP Kim recently prescribed had been "working really well for me," and that the only side effect he experienced was drowsiness. (R. 53.) "That's it." (*Id*.)

The ALJ then took testimony from VE Alberigi, who stated that plaintiff's most recent prior work was as a courier from August 2015 through May 2016, DOT 230.663-010; a gate guard/gate keeper, DOT 372.667-030; a bus driver, DOT 913.463-010; and a van driver, DOT 918.663-018. (R. 59-64.) The ALJ presented VE Alberigi with a hypothetical claimant of plaintiff's age, education, and work experience who can engage in work at all exertional levels, but who had the following specific non-exertional limitations:

> Work is limited to simple, routine tasks. Work in a low stress job defined as having only occasional decision making and only occasional changes in the work setting. Work with only occasional judgment required on the job and no interaction with the public. Occasional interaction with coworkers. Occasional supervision.

(R. 64-65.) VE Alberigi testified that such a hypothetical claimant could not perform plaintiff's past work, but that there were jobs plaintiff was capable of performing, including housekeeper, DOT 323.687-014; packager, DOT 920.587-018; and warehouse worker, DOT 922.687-058. (R. 65.)

---

[9] The only treatment note from NP Kim in the record is from plaintiff's initial visit on October 13, 2017. (R. 354-56.)

The ALJ then posed a second hypothetical to VE Alberigi, identical to the first with one additional limitation: "Because of their psychiatric disability, the person could only work 80 percent of the day." (R. 65-66.) VE Alberigi testified that there would be no jobs for that hypothetical claimant in the labor market, because the maximum time permitted off-task would be approximately 7 to 8% (or "approximately 30 minutes per day"). (R. 66.)

## IV. THE ALJ'S DECISION

### A. Standards

A claimant is "disabled" within the meaning of the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In his March 23, 2018 Decision, the ALJ correctly set out the five-step sequential evaluation process used pursuant to 20 C.F.R. §§ 404.1520(a) to determine whether a claimant over the age of 18 is disabled within the meaning of the Act. (R. 11-12.) The Second Circuit has described the sequence as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1 . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional

> capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

*Jasinski v. Barnhart*, 341 F.3d 182, 183-84 (2d Cir. 2003).

If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation will not progress to the next step. 20 C.F.R. § 404.1520(a)(4). A claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at the fifth step. *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). To support a finding that the claimant is not disabled at step five, the Commissioner must offer evidence demonstrating that other work exists in significant numbers in the national and local economies that the claimant can perform, given his residual functional capacity, age, education, and past relevant work experience. *See* 20 C.F.R. § 404.1560(c). "Under the law of this Circuit and the SSA Guidelines, the ALJ must call a vocational expert to evaluate a claimant's significant non-exertional impairments in order to meet the step five burden." *Lacava v. Astrue*, 2012 WL 6621731, at *18 (S.D.N.Y. Nov. 27, 2012) (citations omitted), *report and recommendation adopted*, 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012).

Prior to steps four and five, the ALJ must determine the claimant's residual functional capacity (RFC), that is, the "most [a claimant] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1). The claimant's RFC is determined based on all of the relevant medical and other evidence in the record, including the claimant's subjective testimony, objective medical evidence, and medical opinions from treating and consulting sources. 20 C.F.R. § 404.1545(a)(3).

**B. Application of Standards**

At step one, the ALJ found that plaintiff engaged in substantial gainful activity during 2015 and 2016. (R. 12.) However, because plaintiff's earnings in 2017 "dropped significantly below the

required substantial gainful activity levels," the ALJ found it "prudent to continue in the sequential evaluation process[.]" (*Id.*)

At step two, the ALJ found that plaintiff had the severe impairments of "anxiety disorder, major depressive disorder, and substance abuse." (R. 13.)

At step three, the ALJ found that plaintiff did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR 404.1520(d), 404.1525, and 404.1526." (R. 13.)

Plaintiff does not challenge the ALJ's determinations at steps one through three.

Before proceeding to step four, the ALJ determined that plaintiff had the RFC "to perform a full range of work at all exertional levels but with the following nonexertional limitations: limited to simple, routine tasks; work in a low stress job, as defined as having only occasional decision making and only occasional changes in work setting; can work in jobs with occasional judgment required on the job; no interaction with the public; can have only occasional interaction with coworkers; can have only occasional interaction with supervision; and limited to work in a job with no fast paced work environments." (R. 14-15.)

In determining plaintiff's RFC, the ALJ found that plaintiff's "impairments could reasonably be expected to cause the alleged symptoms," but that his "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" (R. 15.) In support of this finding, the ALJ summarized the medical evidence in the record, emphasizing that plaintiff's symptomology was generally "mild" in the 2014-15 period (which the ALJ reviewed for "longitudinal purposes") and did not prevent him from engaging in SGA; that there were no records regarding plaintiff's mental health impairments in 2016, during which he also engaged in SGA; that his "medication helped to

improve his symptoms," and that when he presented himself to the Jacobi emergency room in September 2017, he "had ceased to take his medications, which caused the resurgence of his symptoms." (R. 16.) The ALJ also noted that, prior to his emergency room visit, plaintiff had engaged in treatment only "intermittent[ly]" and had been "self-medicat[ing]" with illicit drugs and alcohol (*id.*),[10] and that he was discharged from Jacobi with "only a community referral." (*Id.*)

Turning to the opinion evidence, the ALJ gave "great weight" to the opinion of the state agency consultant, Dr. Bhutwala, who opined that plaintiff "had no more than moderate limitations in all domains of work-related mental functioning." (R. 17.) The ALJ found Dr. Bhutwala's opinion to be "consistent with the claimant's conservative treatment records consisting only of therapy and medication," and "supported by the claimant's activities of daily living including the ability to care for his nephew by taking him to school, picking him up, and assisting him with his homework." (*Id.*)

At step four, on the basis of his RFC determination, the ALJ found that plaintiff was unable to perform any past relevant work. (R. 17.)

At step five, the ALJ found that, considering plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that plaintiff can perform. (R. 18.) Based on the testimony of VE Alberigi, the ALJ concluded that plaintiff could be employed as a housekeeper, packager, or warehouse worker. (*Id.*) The ALJ therefore found that plaintiff was not disabled, as defined in the Act, from July 25, 2014 through March 23, 2018, the date of the Decision. (R. 18-19.)

---

[10] It is not clear why the ALJ referred to alcohol in his Decision. NP Kim's psychiatric assessment mentioned only cocaine and "molly," which according to the National Institutes of Health usually means the drug 3,4-methylenedioxy-methamphetamine (MDMA), also known as "Ecstasy." *See* https://www.drugabuse.gov/publications/drugfacts/mdma-ecstasymolly (last visited Nov. 24, 2020).

## V. ANALYSIS

Both parties have moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). To prevail on such a motion, a party must establish that no material facts are in dispute and that judgment must be granted to that party as a matter of law. *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 642 (2d Cir. 1988); *Claudio v. Comm'r of Soc. Sec.*, 2017 WL 111741, at *1 (S.D.N.Y. Jan. 11, 2017).

The law governing cases such as this is clear. The reviewing court "may set aside an ALJ's decision only where it is based upon legal error or where its factual findings are not supported by substantial evidence." *McClean v. Astrue*, 650 F. Supp. 2d 223, 226 (E.D.N.Y. 2009) (citing *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998)); *accord Longbardi v. Astrue*, 2009 WL 50140, at *21 (S.D.N.Y. Jan. 7, 2009). Thus, the district court must first decide whether the Commissioner applied the correct legal standards. *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Calvello v. Barnhart*, 2008 WL 4452359, at *8 (S.D.N.Y. Apr. 29, 2008), *report and recommendation adopted*, 2008 WL 4449357 (S.D.N.Y. Oct. 1, 2008). If there was no legal error, the court must determine whether the ALJ's decision was supported by substantial evidence. *Tejada*, 167 F.3d at 773; *Calvello*, 2008 WL 4452359, at *8.

"Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). However, the reviewing court's task is limited to determining whether substantial evidence exists to support the ALJ's fact-finding; it may not reweigh that evidence or substitute its judgment for that of the ALJ where the evidence is susceptible of more than interpretation. "[O]nce an ALJ finds facts, [the court] can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original)

(quotation marks and citation omitted). Thus, if the ALJ's determinations are supported by substantial evidence, "the Court must affirm the decision of the [Commissioner] even if there is also substantial evidence for plaintiff's position." *Gernavage v. Shalala*, 882 F. Supp. 1413, 1417 n.2 (S.D.N.Y. 1995) (citing *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982)); *accord Johnson v. Astrue*, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008). The substantial evidence standard is "a very deferential standard of review – even more so than the 'clearly erroneous' standard." *Brault*, 683 F.3d at 448; *see also Brown v. Colvin*, 73 F. Supp. 3d 193, 198 (S.D.N.Y. 2014).

"[T]he crucial factors in any determination must be set forth with sufficient specificity to enable [the reviewing court] to decide whether the determination is supported by substantial evidence." *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984). But if the ALJ adequately explains his reasoning, and if his conclusion is supported by substantial evidence, the district court may not reverse or remand simply because it would have come to a different decision on a *de novo* review. "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotation marks omitted); *see also Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) ("the court should not substitute its judgment for that of the Commissioner").

**A. Plaintiff's Contentions**

In this case, plaintiff primarily contends that the ALJ failed in his duty to develop the record by failing to request an updated opinion as to plaintiff's mental impairments. Pl. Mem. (Dkt. No. 16) at 6-9. According to plaintiff, Dr. Bhutwala's 2015 opinion had become "stale" by the time of the hearing, particularly in light of the "worsening" of plaintiff's condition in 2017, as evidenced by his emergency room visit and his new diagnosis of bipolar II disorder. *Id.* at 6-8. Therefore, in plaintiff's view, the ALJ should have either re-contacted plaintiff's treating sources or ordered a

consultative examination, rather than "interpret the raw medical data" himself. *Id*. at 8-9. As a fallback position, plaintiff argues that even if the ALJ was entitled to rely on Dr. Bhutwala's opinion, he erred by failing to "include all of the limitations contained therein." *Id*. at 10. In particular, according to plaintiff, the ALJ "failed to account for any additional off-task time due to Dr. Bhutwala's opinion that plaintiff was moderately limited in his ability to maintain concentration, perform within a schedule, or sustain an ordinary routine without supervision." *Id*. at 11.

The Commissioner counters that the ALJ discharged his duty to develop the record by asking (three times) for an opinion from Dr. Marrero-Figarella[11]; that he did not "abuse his discretion" in not ordering a consultative examination; and that in any event Dr. Bhutwala's opinion was not "stale" because the 2017 records did not "rais[e] any doubts as to the reliability of the opinion." Def. Mem. (Dkt. No. 20) at 13-22. Defendant further argues that an ALJ's RFC determination need not perfectly track the opinion of any medical source, even one given "great " weight, *id*. at 21, and that in this case there was no inconsistency between Dr. Bhutwala's conclusion – that plaintiff was capable of "simple, entry-level rote work in a low contact setting" – and the ALJ's RFC determination. *Id*. at 16. The Commissioner adds that the ALJ's RFC determination was supported by substantial evidence and that the ALJ correctly evaluated plaintiff's subjective complaints. *Id*. at 13-20.

### B. Duty to Develop the Record

"Whether the ALJ has met his duty to develop the record is a threshold question" which the Court must determine "[b]efore reviewing whether the Commissioner's final decision is

[11] For applications filed prior to March 27, 2017, nurse practitioners are not acceptable medical sources. *See* SSR 06-3p, 2006 WL 2329939, at *2 (S.S.A. Aug. 9, 2006). Thus, the ALJ did not seek a medical opinion from NP Kim.

supported by substantial evidence." *Craig v. Comm'r of Soc. Sec.*, 218 F. Supp. 3d 249, 261 (S.D.N.Y. 2016). "[T]he social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks and citations omitted). It is the ALJ's duty "to investigate and develop the facts and develop the arguments both for and against the granting of benefits." *Id.* at 112-13. To that end, the ALJ must make "every reasonable effort" to help the claimant get medical evidence from his treating physician(s), *see* 20 C.F.R. § 404.1512(b)(1), including, where possible, "expert opinions as to the nature and severity of the claimed disability." *Oliveras ex rel. Gonzalez v. Astrue*, 2008 WL 2262618, at *6 (S.D.N.Y. May 30, 2008) (quoting *Pabon v. Barnhart*, 273 F. Supp. 2d 506, 514 (S.D.N.Y. 2003)) (alteration in original; internal quotation marks omitted), *report and recommendation adopted*, 2008 WL 2540816 (S.D.N.Y. June 25, 2008); *see also Hooper v. Colvin*, 199 F. Supp. 3d 796, 812 (S.D.N.Y. 2016) (quoting *Molina v. Barnhart*, 2005 WL 2035959, at *6 (S.D.N.Y. Aug. 17, 2005)) ("the ALJ must 'make every reasonable effort to obtain not merely the medical records of the treating physician but also a report that sets forth the opinion of the treating physician as to the existence, the nature, and the severity of the claimed disability'").[12]

Where, as here, the SSA made a reasonable effort but could not obtain an opinion from the claimant's relevant treating physician – or where the record is otherwise insufficient to make a disability determination – the ALJ "may" ask the claimant "to attend one or more consultative examinations at [the SSA's] expense." 20 C.F.R. § 404.1512(b)(2). The ALJ may also rely on the

[12] A "reasonable effort" means "an initial request for evidence from your medical source," followed by one follow-up request 10 to 20 days later. 20 C.F.R. § 404.1512(b)(1)(i).

opinion of a non-examining state agency consultant, which can constitute substantial evidence "when consistent with the record as a whole." *Brown v. Saul*, 2020 WL 6048910, at *5 (W.D.N.Y. Oct. 13, 2020) (quoting *Diaz v. Colvin*, 2014 WL 2931583, at *6 (W.D.N.Y. June 27, 2014)); *accord Martinez v. Saul*, 2020 WL 2731000, at *10 (S.D.N.Y. May 26, 2020); *Leach ex rel. Murray v. Barnhart*, 2004 WL 99935, at *9 (S.D.N.Y. Jan. 22, 2004) ("State agency physicians are qualified as experts in the evaluation of medical issues in disability claims. As such their opinions may constitute substantial evidence if they are consistent with the record as a whole.").

The question raised by plaintiff Cepeda, however, is not whether an ALJ can rely on the opinion of a non-examining state agency consultant; it is whether Dr. Bhutwala's opinion, rendered in 2015, was stale by the date of the Decision. "[M]edical source opinions that are . . . stale[] and based on an incomplete medical record may not be substantial evidence to support an ALJ finding." *Camille v. Colvin*, 104 F. Supp. 3d 329, 343-44 (W.D.N.Y. 2015), *aff'd*, 652 F. App'x 25 (2d Cir. 2016) (quotations and citation omitted). However, "[f]or a medical opinion to be stale, not only must there be a significant period of time between the date of the opinion and the hearing date, there also must be subsequent treatment notes 'indicat[ing] a claimant's condition has deteriorated' over that period." *Ambrose-Lounsbury v. Saul*, 2019 WL 3859011, at *3 (W.D.N.Y. Aug. 16, 2019) (quoting *Whitehurst v. Berryhill*, 2018 WL 3868721, at *4-5 (W.D.N.Y. Aug. 14, 2018)); *see also Amrhein Deruchie v. Commissioner of Social Security*, 2019 WL 5208123, at *8 (W.D.N.Y. Oct. 16, 2019) (ALJ erred in relying on doctor's stale opinion where, after the opinion was rendered, plaintiff was "hospitalized multiple times for attempted suicide and Lamictal overdose"); *Davis v. Berryhill*, 2018 WL 1250019, at *3 (W.D.N.Y. Mar. 11, 2018) (2011 medical opinions were stale where "significant developments in Plaintiff's medical history had occurred since" the opinions were issued, including inpatient treatment for seven days in 2012 following a

voluntary mental health arrest, with a GAF score between 11 and 20 upon admission, a second emergency room visit in 2013 (via ambulance), with a GAF score between 11 and 20 upon admission, and consistently abnormal mental health examinations from 2012 forward).

Even a "dated opinion" will not be deemed stale, and may constitute substantial evidence, "if it is consistent with the record as a whole," *Santiago v. Commissioner of Soc. Sec.*, 2020 WL 1922363, at *5 (S.D.N.Y. Apr. 21, 2020), and where there is "no evidence of an intervening event (such as a new injury) or significant deterioration" in the plaintiff's condition. *Id*. at *6; *see also Teresi v. Comm'r of Soc. Sec.*, 2020 WL 5105163, at *18 (S.D.N.Y. Aug. 31, 2020) (opinion rendered two years before the hearing – and prior to plaintiff's brain surgery – was not stale where "the record suggests that Teresi's seizure disorder had, in fact, improved since her surgery" and "there is no evidence . . . to suggest that Teresi's condition deteriorated after Dr. Broska's opinion such that it should be rendered stale").

Here, as in *Santiago* and *Teresi*, there is no evidence that plaintiff's condition "deteriorated" between 2015 and 2017, much less to the "significant" degree required to render Dr. Bhutwala's opinion impermissibly stale. To the contrary: plaintiff's condition apparently improved in 2015 and 2016, permitting him to engage in SGA in both of those years. Moreover, insofar as the record shows, plaintiff neither sought nor required any mental health treatment for approximately two years, from January 2015 until January 2017.

It is true that Dr. Marrero-Figarella's January 5, 2017 treatment note included a new diagnosis, bipolar II disorder (R. 352),[13] and that nine months later, on September 23, 2017, plaintiff visited the Jacobi emergency room complaining of, among other things, depression. (R.

[13] Bipolar II Disorder is a mood disorder characterized by at least one hypomanic episode and at least one major depressive episode. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, at 132-34 (5th ed. 2013).

359.) The basis for the bipolar II diagnosis, however, is murky at best, and was not repeated by any of the other mental health professionals who saw plaintiff in 2017. There is no suggestion in any of Dr. Marrero-Figarella's treatment notes (or elsewhere) that plaintiff experienced any hypomanic episodes. Moreover, his mental status exam on January 5, 2017 was similar to his 2014 exam and in many respects improved over his 2015 exam, in that his insight and judgment were "fair" (R. 352) rather than "poor" (R. 346), and although plaintiff was "restless" and "fidgety" (R. 352), he did not "run[ ] around or climb" in inappropriate situations. (R. 346.) Moreover, Dr. Marrero-Figarella's treatment plan for plaintiff was unchanged in 2017, except for the addition of Latuda. (*Compare* R. 346-47 *with* 352-53.) I cannot conclude that the mere fact of an additional diagnosis, without any evidence of significantly worsening symptoms, required the ALJ to obtain fresh opinion evidence.

The same is true of plaintiff's September 2017 hospital visit. Plaintiff acknowledged, at Jacobi, that he had not been taking his medication (R. 366), had not seen his psychiatrist in many months (*id.*), and had financial and housing-related stressors. (*Id.*) Significantly, Jacobi did not deem him in need of admission; it referred him to community resources. (R. 367.) During his follow-up appointment with NP Kim, plaintiff acknowledged that he had used cocaine that same day and was using molly on weekends. (R. 354). By the time of his hearing in December 2017, plaintiff was back on his prescribed medication and testified that it had been "working really well" for him with minimal side effects. (R. 53.)

Since there were no "significant developments in Plaintiff's medical history" after Dr. Bhutwala rendered his opinion, *Davis*, 2018 WL 1250019, at *3, and no "significant deterioration" in his condition, *Santiago*, 2020 WL 1922363, at *5, the ALJ did not err in relying on Dr. Bhutwala's opinion in his Decision.

**C. Substantial Evidence Supported the ALJ's RFC Determination**

As noted above, a claimant's RFC is the most he can do despite his limitations. 20 C.F.R. § 404.1545(a)(1); *see also* SSR 96-8p, 1996 WL 374184, at *4 (S.S.A. July 2, 1996). The ALJ must assess the claimant's RFC based on all the relevant medical and other evidence of record, taking into consideration the limiting effects of all the claimant's impairments. *See* SSR 96-8p, 1996 WL 374184, at *2, 5. The relevant evidence includes the claimant's medical history, "effects of treatment," reports of the claimant's daily activities, medical source statements, "effects of symptoms," and "[e]vidence from attempts to work," among other things. *Id.* at *5.

Regardless of how many medical source statements the ALJ receives – or the weight he assigns to them – the determination of the claimant's RFC is reserved to the ALJ, who is not required to accept, or follow, any one medical opinion in toto. *See*, *e.g*., *Camille v. Colvin*, 652 F. App'x 25, 29 n.5 (2d Cir. 2016) ("An ALJ may accept parts of a doctor's opinion and reject others."); *Landers v. Colvin*, 2016 WL 1211283, at *4 (W.D.N.Y. Mar. 29, 2016) (quoting *Matta v. Astrue*, 508 Fed. App'x 53, 56 (2d Cir. 2013)) ("[A]lthough the RFC 'may not perfectly correspond' with any one of the medical opinions, the ALJ was 'entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole.'"). "[I]t is the ALJ's prerogative to make an RFC assessment after weighing the evidence and the District Court may not reverse provided there is substantial evidence in the record to support her findings." *Moronta v. Comm'r of Soc. Sec.*, 2019 WL 4805801, at *19 (S.D.N.Y. Sept. 30, 2019) (quoting *Mitchell v. Astrue*, 2010 WL 3070094, at *5 (W.D.N.Y. Aug. 4, 2010)). However, the ALJ must provide an explanation if he accords "significant" weight to a medical source statement but "fail[s] to adopt the portions of those opinions that were potentially favorable to Plaintiff's claim of disability." *Long v. Berryhill*, 2019 WL 1433077, at *2 (E.D.N.Y. Mar. 29, 2019) (remanding where ALJ gave "significant weight" to Dr. Berrios's opinion but "failed to explain how Dr.

Berrios's finding of Plaintiff's moderate limitations in following instructions and making work-related decisions factored into the RFC").

In this case, there is substantial evidence to support the ALJ's RFC determination. In addition to the opinion of Dr. Bhutwala, the ALJ expressly considered, among other things, plaintiff's statements about his symptoms, the effects of his medication, his activities of daily living, and the medical record (including records post-dating Dr. Bhutwala's analysis). He ultimately concluded that plaintiff had the RFC to perform a full range of work at all exertional levels but with certain nonexertional limitations. Specifically, the ALJ found that plaintiff was "limited to simple, routine tasks; work in a low stress job, as defined as having only occasional decision making and only occasional changes in work setting; can work in jobs with occasional judgment required on the job; no interaction with the public; can have only occasional interaction with coworkers; can have only occasional interaction with supervision; and limited to work in a job with no fast paced work environments." (R. 14-15.)

Plaintiff argues that the RFC fails to take into account the analysis that Dr. Bhutwala performed when assessing plaintiff's RFC, and in particular his opinion that plaintiff was "moderately limited in his ability to maintain concentration, perform within a schedule, or sustain an ordinary routine without supervision." Pl. Mem. at 11. According to plaintiff, the ALJ should have "accounted for these limitations" by providing plaintiff with "additional off-task time," or else "explained why he found them unpersuasive." *Id*. at 11-12.

As the Commissioner points out, however, the opinions to which plaintiff points are found in Dr. Bhutwala's "Mental Residual Functional Capacity Assessment worksheet" (R. 89-91), rather than in his "actual mental residual functional capacity assessment," which was expressed in narrative form (R. 92) and concluded that plaintiff "is capable of simple, entry level rote work in

a low contact setting." Def. Mem. at 16. In formulating plaintiff's RFC, the ALJ incorporated this opinion (as well as Dr. Bhutwala's underlying analysis) by limiting plaintiff to "simple, routine tasks" in a "low stress job" with "no interaction with the public," only "occasional interaction with coworkers" and supervisors, and "no fast paced work environments.” (R. 14-15.) *See Landers*, 2016 WL 1211283, at *4 ("The determination that Plaintiff is limited to 'simple, repetitive, and routine tasks' accounts for Plaintiff's limitations as to maintaining attention and concentration, performing activities within a schedule, and maintaining regular attendance," while the "limitation to a 'low contact work environment' accounts for his moderate social limitations"); *Sipe v. Astrue*, 873 F. Supp. 2d 471, 481 (N.D.N.Y. 2012) (moderate limitations "relating to instructions, concentration, attendance" are consistent with unskilled work); *see also Retana v. Astrue*, 2012 WL 1079229, at *6 (D. Colo. 2012) (ALJ was not required to discuss each "moderate" limitation where ALJ's RFC "adopted some of [the doctor's] moderate limitations such as restricting plaintiff to unskilled work not involving complex tasks, reflecting plaintiff's moderate limitations in his ability to carry out detailed instructions and to maintain concentration for extended periods").

Here, the ALJ "thoroughly discussed and considered" plaintiff's testimony, treatment history, relatively mild symptomology, and activities of daily living, as well as Dr. Bhutwala's opinion, and "incorporated them into the RFC." *See Landers*, 2016 WL 1211283, at *4. I therefore conclude that the ALJ's RFC formulation is supported by substantial evidence and consistent with the record as a whole.

## VI. CONCLUSION

For the foregoing reasons, plaintiff's motion is DENIED, the Commissioner's motion is GRANTED, and this action is DISMISSED.

Dated: New York, New York
November 24, 2020

**SO ORDERED.**

**BARBARA MOSES**
**United States Magistrate Judge**